# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

9REN Holding S.À.R.L.,

                    Plaintiff,

              v.

The Kingdom of Spain,

                    Defendant.

Civil Action No. 19-cv-1871

## EXPERT DECLARATION OF PROFESSOR PIET EECKHOUT

## I.      Introduction

1.      I, Piet Eeckhout, make this declaration based upon my personal knowledge, except as to those statements where I have expressly stated that my opinion is based upon information and belief, and I believe all such statements, and the information upon which they are based, to be true.

2.      I am a Belgian citizen, born on 30 January 1962.

3.      I am currently Professor of European Union ("EU") Law, and Executive Dean of the Faculty of Laws at University College London ("UCL").  I am also Academic Director of the UCL European Institute. Before joining UCL (in 2012), I taught at the Universities of Ghent and of Brussels (Belgium), and was Professor of European Law at King's College London, where I directed the Centre of European Law (between 1998 and 2012).  I also worked as a *référendaire* (law clerk) in the Chambers of Advocate General Francis G. Jacobs, at the European Court of Justice (the "ECJ"), between 1994 and 1998.  My academic interests revolve around EU law generally, and EU external relations law (including the interaction between EU law and public international law) more particularly.  I have published extensively in this field.  I am the sole author of a leading monograph, widely used in the field: *EU External Relations Law* (2nd ed, Oxford EU

Law Library, 2011).  I am further co-editor of the Oxford EU Law Library, a series of monographs published by Oxford University Press and aimed at both academics and practitioners.  I am co-founder and co-editor of an open-access journal, *Europe and the World – A Law Review* (UCL Press).  I have also taught international trade law and have written on questions of public international law, particularly those connected to the relationship between EU law and public international law.  Next to my academic work, I regularly advise barristers and law firms in the context of litigation involving questions of EU law.  Mostly that litigation is before the ECJ.  The most noteworthy cases in which I have been involved are *Kadi*, on the relationship between United Nations ("UN") law and EU law in the context of counterterrorism, and *Wightman and Others*, on the question of whether the United Kingdom could unilaterally revoke its notification to withdraw from the European Union.[1,2]  In both cases the ECJ fully endorsed the arguments I contributed to, and rejected the positions of the EU Council of Ministers and of the European Commission.

4.      My CV, together with a list of my publications, is attached hereto as **Exhibit 1**.

5.      I am being compensated at a rate of GBP 500 per hour to prepare this expert declaration and, if required, to testify in this case.

6.      I have no familial or business relationship or affiliation with any of the parties in the above-captioned matter.  I have never provided legal advice to them or represented them in any capacity.

7.      I have been asked by counsel for the Plaintiff in the above-captioned action to provide an expert declaration on certain legal issues in this action by 9REN Holding S.A.R.L.

---

[1] Attachments to the Expert Declaration of Prof. Dr. Steffen Hindelang, ECF No. 11-2, are hereinafter referenced as "Hindelang Exhibits."

[2] Joined Cases C-402/05 P *Kadi and Al Barakaat v Council and Commission* EU:C:2008:461, **ECF No. 11-3, Hindelang Exhibit 7**; Case C-621/18 *Andy Wightman and Others v Secretary of State for Exiting the European Union* EU:C:2018:999, **Exhibit 2**.

("9REN") to enforce the arbitral award entered in its favour against the Kingdom of Spain ("Spain") in *9REN Holding S.A.R.L. v. The Kingdom of Spain*, ICSID Case No. ARB/15/15 (May 31, 2019) (the "Award").[3]   In particular, I have been asked to give my expert opinion on the following issues:

- the effect, if any, of the judgment of the ECJ on 6 March 2018 in *Slovak Republic v Achmea B.V.* (Case C-284-16) (the "*Achmea* Judgment")[4] on the arbitration of intra-EU disputes under Article 26 of the ECT;

- the effect, if any, of the *Achmea* Judgment on the validity of the arbitration agreement between 9REN and the Kingdom of Spain under the ECT;

- the effect, if any, of the following two statements on the interpretation that must be given to the ECT: (i) a communication of the European Commission (the "EC") addressing intra-EU investment dated 19 July 2018 (the "EC's Communication"); (ii) the joint declaration of twenty-two EU Member States on the Achmea Judgment dated 15 January 2019 (the "First Declaration");

- whether payment or enforcement of the Award would violate EU law on the basis that it would constitute unauthorized State aid; and

- whether, if the Award did constitute unauthorized State aid, that would impact the validity of the Award.

8.      In addressing these topics, and having reviewed the arguments made by Spain and the EC in this case, I consider that it may assist this Court to provide some background on the relationship between EU law and international law and on the operation of agreements to which the EU and its Member States are all parties (so called mixed agreements), such as the ECT.

9.      In addition to basing my opinion on my knowledge of the topics of international law, EU law and international investment law, I have reviewed the relevant parts of the documents listed below, including the Expert Declaration of Professor Dr. Steffen Hindelang, dated January 15, 2020 (the "Hindelang Declaration") that was submitted in support of Spain's motion to dismiss

---

[3] Award, ECF No. 1-1.

[4] *Achmea* Judgment, **ECF No. 11-3, Hindelang Exhibit 9**.

9REN's complaint seeking to enforce the Award. I have been asked to comment, where appropriate, on the views expressed in the Hindelang Declaration, in addressing the above Questions in this Declaration.

- Complaint, dated June 25, 2019, in *9REN Holding S.A.R.L. v. The Kingdom of Spain*, Civil Action No. 1:19-cv-01871, ECF No. 1;

- Defendant The Kingdom of Spain's Memorandum of Points and Authorities in Support of Motion to Dismiss Complaint for Lack of Jurisdiction or in the Alternative to Stay, dated January 15, 2020, in *9REN Holding S.A.R.L. v. The Kingdom of Spain*, Civil Action No. 1:19-cv-01871 ("Spain's Motion to Dismiss"), ECF No. 11-1;

- Expert Declaration of Steffen Hindelang in Support of the Kingdom of Spain's Motion to Dismiss Complaint for Lack of Jurisdiction or in the Alternative to Stay, dated January 15, 2020, *9REN Holding S.A.R.L. v. The Kingdom of Spain*, Civil Action No. 1:19-cv-01871 ("Hindelang Decl."), ECF No. 11-2;

- Expert Declaration of Steffen Hindelang in Support of the Kingdom of Spain's Motion to Dismiss Petition to Enforce Arbitral Award, dated April 22, 2019, in *Masdar Solar & Wind Cooperatief U.A. v. The Kingdom of Spain*, Civil Action No. 1:18-cv-02254-JEB (D.D.C.), ECF No. 15;

- Expert Declaration of Professor Catherine Kessedjian, dated December 1, 2018, in *Novenergia II – Energy & Environment (SCA), Société d' Investissement à Capital Risque v. Kingdom of Spain*, Civil Action No. 1:18-cv-01148-TSC (D.D.C.), ECF No. 23;

- Expert Declaration of Andrea K. Bjorklund, dated January 14, 2019, in *Eiser Infrastructure Limited and Energia Solar Luxembourg S.A.R.L. v. Kingdom of Spain*, Civil Action No. 1:18-cv-01686-CKK (D.D.C.), ECF No. 24;

- Second Expert Declaration of Andrea K. Bjorklund, dated April 22, 2019, in *Eiser Infrastructure Limited and Energia Solar Luxembourg S.A.R.L. v. Kingdom of Spain*, Civil Action No. 1:18-cv-01686-CKK (D.D.C.), ECF No. 39;

- Expert Declaration of Sir Alan Dashwood, dated January 14, 2019, in *Eiser Infrastructure Limited and Energia Solar Luxembourg S.A.R.L. v. Kingdom of Spain*, Civil Action No. 1:18-cv-01686-CKK (D.D.C.), ECF No. 25;

- Second Expert Declaration of Sir Alan Dashwood, dated April 22, 2019, in *Eiser Infrastructure Limited and Energia Solar Luxembourg S.A.R.L. v. Kingdom of Spain*, Civil Action No. 1:18-cv-01686-CKK (D.D.C.), ECF No. 40;

- Expert Declaration of Conor Quigley, dated April 22, 2019, in *Eiser Infrastructure Limited and Energia Solar Luxembourg S.A.R.L. v. Kingdom of Spain*, Civil Action No. 1:18-cv- 01686-CKK (D.D.C.), ECF No. 41; and

- Various intra-EU Awards under the ECT since the *Achmea* Judgment containing hyperlinks to awards or decisions in cases brought under the Energy Charter Treaty (1994), which have referenced the *Achmea* Judgment since the ECJ issued its judgment in that case.

## II.   EXECUTIVE SUMMARY

10.    In summary, my views are as follows:

(i)      I do not consider the *Achmea* Judgment to have any effect on the arbitration of intra-EU disputes under Article 26 of the ECT.  The objections in the *Achmea* Judgment against intra-EU arbitration are expressly confined to bilateral agreements between Member States which have not been concluded by the EU; they therefore do not extend to the ECT.  It is most remarkable that neither Spain nor Professor Hindelang even mention the express distinction which the ECJ made in *Achmea* between agreements purely between EU Member States, and agreements which also have the EU as a Contracting Party.  The latter type of agreements are an integral part of EU law, and they are valid, under EU law, for as long as the EU Courts have not declared them invalid.  That firm principle of EU law, which extends to all acts of the EU institutions, is not acknowledged at all by either Spain or Professor Hindelang.

(ii)     Even if the *Achmea* Judgment were to extend to the ECT, that would not preclude intra- EU arbitration under the ECT.  The validity of Article 26 ECT under international law would not be affected, nor would its interpretation and effect.

(iii)   If there were any conflict between the ECT and EU law as regards the permissibility of intra-EU arbitration under the ECT, the ECJ case law on the primacy of EU law would not regulate such a conflict.  It would be governed by Article 16 ECT, which gives precedence to the ECT.  There is no merit to the argument that Article 16 ECT is, itself, displaced by EU law. Contrary to what Spain and Professor Hindelang argue, on the international plane the EU Treaties do not have primacy over international agreements, be they concluded by the EU itself or by the EU Member States.  The EU respects international law.   There are no authorities in either EU or international law for the above argument.

(iv)   In light of my conclusions (i)–(iii) above, the *Achmea* Judgment has no bearing on the validity of the arbitration agreement between 9REN and the Kingdom of Spain under the ECT.

(v)   As a matter of international law, the EC's Communication and the First Declaration have no bearing on the interpretation to be given to the ECT.

(vi)   Payment of the Award would not violate EU law.  There is no basis to the contentions of Spain or Professor Hindelang in this proceeding that the Award constitutes State aid under EU law that requires notification to the EC before it can be paid or enforced.  Spain and Professor Hindelang completely fail to mention that the EU Commission's State aid decision in *Micula* has been annulled by the EU General Court, on the basis that an arbitral award does not constitute unlawful State aid.

(vii)    Even if the Award did constitute unauthorised EU State aid, that would not affect the validity of either the arbitration agreement between 9REN and Spain or the Award, which, unless annulled, remains binding on Spain.

## III.   BACKGROUND

11.    As explained above, I consider it may assist the Court in following my analysis to provide some background information on: (i) the relationship between EU law and international law; and (ii) the operation of agreements to which the EU and its Member States are all parties (so called mixed agreements), such as the ECT.  Those topics are addressed in turn in this section.

### A.   Relationship Between EU law and Public International Law

12.    The European Union is an organisation created by the conclusion of a series of international treaties — chiefly the Treaty on European Union ("TEU") and the Treaty on the Functioning of the European Union ("TFEU").  In that sense, the law of the European Union ("EU law") has its foundations in public international law, particularly treaty law. The EU respects international law.  Article 3(5) TEU provides that the EU shall, in its relations with the wider world, contribute to "the strict observance and the development of international law".[5]  The EU has legal personality,[6] which encompasses international legal personality.  It therefore has the capacity to act under international law, particularly by means of the negotiation and conclusion of international agreements.[7]  Article 216(2) TFEU provides that "[a]greements concluded by the Union are binding upon the institutions of the Union and on its Member States".  This provision ensures that the EU complies with its international commitments, and respects international law.

---

[5] *See also* Treaty on European Union ("TEU"), art. 21(2), **ECF No. 11-3, Hindelang Exhibit 3**.

[6] TEU, art. 47, **ECF No. 11-3, Hindelang Exhibit 3**.

[7] *See* Art. 216(1) TFEU, **ECF No. 11-3, Hindelang Exhibit 4**. EU law uses the term "agreements" in a generic sense, as encompassing any conventional instruments such as treaties, conventions, agreements, etc.

The EU institutions are bound by any agreements the EU has concluded, including in their legislative function.  The ECJ has confirmed, on numerous occasions, that acts of the institutions, including legislative acts, need to comply with the EU's international obligations.[8]  The Member States are equally bound, simply because agreements concluded by the EU are an integral part of EU law.[9]  These points are significant for the present case because the ECT is an agreement concluded by the EU (together with its Member States),[10] in contrast with the BIT which was in issue in the *Achmea*.

13.     The fact that international agreements concluded by the EU prevail over acts of the EU institutions, including legislative acts, does not mean that such agreements take priority over the EU's founding treaties (TEU and TFEU) – at least not as a matter of EU law. In this respect the TEU and the TFEU are functionally equivalent to most States' constitutions, which do not allow the State's institutions to conclude international agreements which derogate from, or conflict with constitutional norms. The ECJ has established, in a very limited number of cases, that the provisions of a particular international agreement violate EU constitutional norms.[11]   In such cases it will annul the EU's internal act by which the agreement was concluded, or declare that act invalid.[12] It cannot, however, annul the agreement itself, quite simply because that is beyond its jurisdiction.[13]   The ECJ's jurisdiction is confined to EU law. International agreements concluded by the EU, or non-conventional international norms such as general principles and

---

[8] *See e.g.*, Case C-344/04 *The Queen ex parte IATA v Department for Transport* EU:C:2006:10 ¶ 35, **Exhibit 3**; Case C-308/06 *Intertanko* EU:C:2008:312 ¶ 42, **Exhibit 4**.

[9] Case 181/73 *Haegeman* EU:C:1974:41 ¶ 5, **Exhibit 5**.

[10] *See infra* ¶¶ 21-29, 40-42.

[11] *See e.g.* Case C-122/95 *Germany v Council* EU:C:1998:94, **Exhibit 6.**

[12] Those two remedies – annulment and a declaration of invalidity – are equivalent. The difference lies in the judicial procedure by which the agreement is challenged before the ECJ: either in a (direct) action for annulment (Art. 263 TFEU); or on a reference from a Member State court asking whether the act concluding an agreement is invalid (indirect action – Art. 267 TFEU).

[13] Case C-327/91 *France v Commission* EU:C:1994:305 ¶¶ 13-17, **Exhibit 7**.

customary international law which are relevant to the EU's international activities, can be interpreted and relied upon by the ECJ.  However, the ECJ cannot, as the court of one of the parties to an international agreement, declare that agreement invalid as a matter of public international law.  This is in conformity with Article 46 of the Vienna Convention on the Law of Treaties (hereafter "VCLT").[14]  Where a breach of the EU treaties is found, the EU institutions need to either renegotiate the EU's commitments, or terminate them, so as to remove the breach.

14.      In order to avoid such difficulties, the drafters of the EU Treaties have, with great foresight, created a special procedure in Article 218(11) TFEU. This provision allows any Member State, as well as the European Parliament, the Council or the Commission, to ask the ECJ whether an agreement which the EU *envisages* to conclude, but has not yet concluded, "is compatible with the Treaties".[15]  As the ECJ has stated, this procedure aims "to forestall complications which would result from legal disputes concerning the compatibility with the [EU Treaties] of international agreements binding upon the Community [now the EU]".[16]  It has been used for CETA, resulting in Opinion 1/17, an ECJ ruling which is highly relevant for the purpose of answering some of the objections to the enforcement of the Awards in the present case.[17]  It is also worth noting that Article 218(11) TFEU confirms that the EU Treaties cannot, on the international plane, override any treaties or agreements the EU concludes.  It does so by stating that "[w]here the opinion of the Court is adverse, the agreement envisaged may not enter into force unless it is amended or the Treaties are revised".[18]  In other words, any incompatibilities need to be removed before the

---

[14] Art 46 provides that "1. A State may not invoke the fact that its consent to be bound by a treaty has been expressed in violation of a provision of its internal law regarding competence to conclude treaties as invalidating its consent unless that violation was manifest and concerned a rule of its internal law of fundamental importance."  Vienna Convention on the Law of Treaties ("VCLT"), **ECF No. 11-4, Hindelang Exhibit 32**.

[15] Treaty on the Functioning of the European Union ("TFEU"), art. 218(11), **ECF No. 11-3, Hindelang Exhibit 4**.

[16] Opinion 1/75 *re Understanding on a Local Cost Standard* EU:C:1975:145, at 1360, **Exhibit 8**.

[17] Opinion 1/17 *re CETA* EU:C:2019:341, **ECF No. 11-3, Hindelang Exhibit 19**.

[18] TFEU, art. 218(11), **ECF No. 11-3, Hindelang Exhibit 4**.

agreement can be concluded, and this may include a revision of the EU Treaties. This is necessary to avoid a conflict between the EU's international commitments and the EU Treaties. Such a conflict could be difficult to resolve if the third countries concerned were not amenable to renegotiating those commitments.

15.    The EU Member States continue to be international actors, capable of concluding international agreements with other States or with international organizations, independently from the EU. This includes agreements with other Member States. A good example is double-taxation treaties.[19] It is only in matters covered by so-called exclusive EU treaty-making competences that the Member States have lost this capacity.[20] Trade policy (the "common commercial policy") is the most significant area of exclusive EU competence.[21]

16.    The EU Member States must comply with their EU law obligations when concluding international agreements, acting on their own. There is in this sense no difference between what the Member States do within the four corners of their domestic laws, and what they commit to internationally. The ECJ may therefore establish that certain provisions in treaties or agreements concluded by one or more Member States violate EU law. The *Achmea* Judgment is one such instance.[22] Again, however, the ECJ is incapable of annulling or invalidating such a treaty or agreement on the international plane. Where a breach is established, the relevant Member State is simply under an EU law obligation to remove the breach, by either renegotiating the relevant terms, or by denouncing or terminating the agreement in issue.

---

[19] For the ECJ's recognition of such treaties, *see e.g.* Case C-648/15 *Austria v Germany* EU:C:2017:664, **Exhibit 9**.

[20] *See* TFEU, art. 3, **ECF No. 11-3, Hindelang Exhibit 4**.

[21] *See* TFEU, arts. 3(1)(a), (e) , **ECF No. 11-3, Hindelang Exhibit 4**.

[22] Regarding BITs, *see also* Case C-205/06 *Commission v Austria* EU:C:2009:118, **Exhibit 10**; Case C-249/06 *Commission v Sweden* EU:C:2009:119, **Exhibit 11**; and Case C-118/07 *Commission v Finland* EU:C:2009:715, **Exhibit 12**.

17.     A closer reading of the *Achmea* Judgment confirms this: The ECJ only established that the dispute settlement system in the Netherlands-Slovakia BIT was not in conformity with EU law.[23]  It is therefore completely orthodox that the European Commission has advised the Member States to terminate all intra-EU bilateral BITs: The *Achmea* Judgment, in and of itself, cannot have any effect on the existence and validity of such agreements under international law.  For the EU-law incompatibility to be removed, the Member States need to act under international law, by either amending or terminating these BITs.  Moreover, the *Achmea* judgment, delivered pursuant to a preliminary reference from the German *Bundesgerichtshof*, could not, on its own, invalidate even that particular BIT.  All the ECJ did was to interpret EU law, in such a way as to assist the referring court when deciding whether to give effect to the set-aside application before it.  The ECJ ruled that the arbitration provisions of an agreement "such as" the Netherlands-Slovakia BIT are in breach of EU law.[24]  The *Bundesgerichtshof* then applied that EU law finding to the actual BIT, and more specifically to the application for the set aside of an award made under that BIT.[25]  It ensured that EU law was complied with, and that the award was not enforced, by ruling that there was no valid agreement to arbitrate.[26]  That was the German court's ruling, in that particular case, which involved a BIT that had been specifically addressed by the ECJ.  It was not the ECJ's ruling, nor could it have been, as the ECJ's jurisdiction did not extend to the BIT as such.

---

[23] *See Achmea* Judgment ¶ 7(i), in operative part, **ECF No. 11-3, Hindelang Exhibit 9**.

[24] *Id.*

[25] The Bundesgerichtshof was empowered to consider the application for set aside because the arbitration had been conducted under the UNCITRAL Rules and was seated in Frankfurt, Germany. *See also Achmea* Judgment, **ECF No. 11-3, Hindelang Exhibit 9**.

[26] Bundesgerichtshof [BGH] [Federal Court of Justice] Oct. 31, 2018, I ZB 2/15, *Slovak Republic v. Achmea B.V. (Ger.)*, **ECF No. 11-5, Hindelang Exhibit 44**.

18.     The fact that the EU's founding Treaties, or EU law more generally, cannot invalidate treaties or agreements which the Member States have concluded, on their own, is confirmed by Article 351 TFEU.  That provision states, in relevant part:

> The rights and obligations arising from agreements concluded before 1 January 1958 [the date of entry into force of the original EEC Treaty] or, for acceding States, before the date of their accession, between one or more Member States on the one hand, and one or more third countries on the other, shall not be affected by the provisions of the Treaties.
>
> To the extent that such agreements are not compatible with the Treaties, the Member State or States concerned shall take all appropriate steps to eliminate the incompatibilities established.

19.     As can be seen, this is not a provision which establishes a primacy rule in favor of EU law.  As Advocate General Mischo established in *Commission v Portugal*,[27] the first paragraph of this provision is merely declaratory, in the sense that it confirms the international law principle of *pacta sunt servanda*.  It is obvious that the EU Treaties cannot modify the obligations which Member States have entered into towards third countries.

20.     There is also extensive case law on Article 351 TFEU.[28]  It is worth highlighting that the provision does not apply to agreements between two Member States ("intra-EU agreements"), simply because those agreements are – from an EU law perspective[29] – superseded by the EU Treaties and do not confer any rights on third countries.[30]  However, as Advocate General Warner pointed out in *Henn and Darby*, a multilateral agreement concluded by Member States and third countries may create multilateral obligations between all the parties

---

[27] Opinion of Mischo AG in Case C-62/98 *Commission v Portugal* EU:C:1999:509 ¶ 56, **Exhibit 13**.  This statement has strong judicial authority, in light of the role and function of Advocates General at the ECJ: they are full members of the Court, and their role is to deliver reasoned opinions in cases pending before the Court.  They are completely independent, and the Opinions of Advocates General are followed by the Court in a significant majority of cases.

[28] *See* P. Eeckhout, EU External Relations Law (2nd ed, Oxford University Press 2011), at 421-434, **Exhibit 14**.

[29] Not necessarily from an international law perspective.

[30] *See e.g.*, Case C-546/07 *Commission v Germany* EU:C:2010:25  ¶ 44, **ECF No. 11-3, Hindelang Exhibit 29**.

to it, so that third countries have a right to have its provisions observed, even in relations between EU Member States.[31]  The ECJ itself has never ruled on this point. The ECT is of course a multilateral agreement concluded by Member States and third countries – and indeed by the EU itself.

## B.    Mixed Agreements and the ECT

21.    It may also assist this Court to say a few words about the reasons for so-called mixed agreements (such as the ECT), and about some of the characteristics and effects of such agreements.

22.    Mixed agreements, *i.e.*, agreements which have the EU, its Member States, and third countries as contracting parties, are a prevalent phenomenon in the EU's foreign affairs.  The need for such agreements arises because the EU is not a sovereign State with full and complete treaty-making powers.  The EU's competences are limited by the principle of conferral: "the Union shall act only within the limits of the competences conferred upon it by the Member States in the Treaties to attain the objectives set out therein. Competences not conferred upon the Union in the Treaties remain with the Member States".[32]  This principle extends to the EU's external action (as it is called), including its treaty-making activities.  A mixed agreement is needed where the matters covered by the agreement do not all come within the EU's competence.

23.    The ECT is such a mixed agreement.  At the time of its conclusion, it was considered that not all of its provisions came within the EU's exclusive external competences. That continues to be the case, notwithstanding the further development of the EU's competences in the field of energy.  It is indeed a fact that, since the conclusion of the ECT, the EU has adopted

---

[31] Opinion of Warner AG in Case 34/79 Henn and Darby EU:C:1979:246, at 3833, **Exhibit 15**.

[32] TEU, art. 5(2), **ECF No. 11-3, Hindelang Exhibit 3**.

extensive legislation in energy matters, regulating its internal energy market.  It has also been conferred specific legislative competences.[33]  However, those competences are not exclusive of Member States' competences, but shared with them (Arts. 4(2)(a), (i) TFEU).  What that means is that the EU is able to claim an exclusive treaty-making competence in the field of energy only where an international agreement affects EU legislation in such a way as to trigger Article 3(2) TFEU.[34]  It is clear that a range of aspects of international energy policy do not come within the EU's exclusive treaty-making competence, and that the ECT, if it was concluded today, would again have to be concluded as a mixed agreement.  Moreover, the ECJ recently established that provisions in an international agreement on investor-State dispute settlement which have the effect of excluding the jurisdiction of the ordinary courts of the Member States, in favour of international arbitration, are not within EU competence.[35]  It made that finding in its Opinion on the EU-Singapore Free Trade Agreement.  The dispute settlement provisions of that agreement in the sphere of investment protection are, in this respect, equivalent to those of the ECT.  This means that the dispute settlement provisions of the ECT continue to be a matter of mixed competence.

24.     When the EU and its Member States conclude a mixed agreement, there are, in theory, a number of options open to them.  They could identify, in the agreement itself, the parts or provisions which are concluded by, respectively, the EU, and by the Member States.  That option is rarely used, if at all.  They could also indicate the scope of their respective competences

---

[33] *See* TFEU, art. 194, **ECF No. 11-3, Hindelang Exhibit 4**.

[34] Art. 3(2) of the TFEU provides that "[t]he Union shall also have exclusive competence for the conclusion of an international agreement when its conclusion is provided for in a legislative act of the Union or is necessary to enable the Union to exercise its internal competence, or in so far as its conclusion may affect common rules or alter their scope." TFEU, **ECF No. 11-3, Hindelang Exhibit 4**.  In Case C-66/13 *Green Network SpA* EU:C:2014:2399, **Exhibit 16**, the ECJ established exclusive EU competence on the basis of EU Directive 2001/77, as regards the purchase of green electricity certificates.

[35] Opinion 2/15 *re EU-Singapore FTA* EU:C:2017:376 ¶ 292, **Exhibit 17**.

in some other way, for example by means of a "declaration of competences".  That is an option which the EU and the Member States regularly employ.[36]  They have done so, for example, when concluding the UN Convention on the Law of the Sea (UNCLOS).  It is also open to the EU and the Member States to negotiate a mixed agreement which operates in an essentially bilateral way.  This is the case for most of the free-trade agreements which the EU concludes.  Such agreements usually provide that they apply, on the one hand, in the territory of the third country (say Canada), and on the other, in the territory of the EU and its Member States.[37]  The EU could also negotiate a "disconnection clause," which would assert the non-applicability of certain provisions to treaty disputes exclusively between EU Member States.  Such a disconnection clause may be used where the EU considers there to be potentially overlapping obligations between an EU Member States' treaty obligations and its EU obligations, and therefore a "disconnection clause" is needed to express (and ensure) the primacy of EU law.

25.    None of those options were used in the case of the ECT.  Giving meaning to the ordinary meaning of the terms used, in their context and in the light of a treaty's object and purpose, is the first customary international law rule of treaty interpretation.[38]  A simple reading of the terms of the ECT, in their ordinary meaning, confirms that all of the Contracting Parties are bound by all of the ECT's provisions, and have entered into obligations towards all other Contracting Parties.  In other words, nothing suggests that the ECT does not apply in an intra-EU context.

---

[36] *See* M. Cremona, "Disconnection Clauses in EU Law and Practice", in C Hillion and P Koutrakos (eds), *Mixed Agreements Revisited* (Oxford and Portland, Oregon: Hart Publishing, 2010) at 160–186, **Exhibit 18**.

[37] *See e.g.*, CETA, art. 1.3, **Exhibit 19**; *see* Council Decision (EU) 2017/37 of 28 October 2016 on the signing on behalf of the European Union of the Comprehensive Economic and Trade Agreement (CETA) between Canada, *of the one part*, and the European Union and its Member States, *of the other part* (EU OJ 2017 L 11 at 1, italics added), **Exhibit 20**.

[38] *See* Art. 31(1) of the Vienna Convention on the Law of Treaties, which is regarded as codifying the relevant customary international law rules, **ECF No. 11-4, Hindelang Exhibit 32**.

26.     There is nothing extraordinary about this.  The EU and its Member States are parties to a range of mixed agreements which regulate, not only the relations between the EU and third countries, but also between EU Member States.  UNCLOS is again an example.  Many of its provisions (for example on territorial waters, exclusive economic zones, rights of passage, etc.) apply in an intra-EU context.  This is implicitly confirmed by the *Mox Plant* case.[39]  In that case, Ireland started UNCLOS proceedings against the United Kingdom for breach of a number of environmental provisions in UNCLOS.  The Commission then brought a successful action against Ireland in the ECJ, on the basis that Ireland had sought to include violations of EU environmental legislation in the UNCLOS dispute.  That constituted a breach of the autonomy of EU law, and of Article 344 TFEU, which provides for the ECJ's exclusive jurisdiction over disputes between Member States on EU law matters.  However, at no point did the Court suggest that Ireland could not have brought an UNCLOS dispute against the UK on UNCLOS provisions which are entirely within Member State competence — for example a dispute on territorial waters.  The Court's reasoning was carefully confined to UNCLOS provisions which are within EU competence and to Ireland's reliance on relevant EU legislation.

27.     As regards specifically the ECT, there is no inherent conflict between the application of EU law, particularly internal market law, in the relations between EU Member States, and the application of the ECT.  The objectives of the ECT are broadly aligned with the basic policy principles that guide EU economic regulation.[40]  The ECT provisions on investment protection are complementary to EU internal market law, in the sense that they provide an investor with additional protection.  Between the Member States, the right of establishment, the freedom to

---

[39] *See* Case C-459/03 *Commission v Ireland (Mox Plant)*, EU:C:2006:345, **ECF No. 11-3, Hindelang Exhibit 20**.

[40] *See e.g. Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Award, 25 November 2015, **Exhibit 21**.

provide services and the free movement of capital offer significant guarantees against discriminatory treatment and unwarranted regulatory restrictions.  Those basic freedoms also underpin sector-specific legislation.  EU competition and State aid policy ensure that distortions of competition caused by anti-competitive behaviour or government subsidies are combated.  But none of this means that there is no room left for the ECT provisions, particularly those on investor protection.  The additional protection of those provisions is complemented by strong remedies, particularly as regards financial compensation.  Those remedies are arguably stronger than those for which EU law provides: It is only where a Member State has committed a "sufficiently serious" breach of EU law that an investor from another Member State is entitled to compensation ("Member State liability").[41]  It is not at all clear on what basis the Plaintiff in this case  would have been able to obtain compensation in the Spanish courts pursuant to the EU law principles governing Member State liability.

28.     Spain insists that "EU law governs the relationship between Spain and 9REN".[42] That is true, to the extent that any parts of that relationship come within the scope of EU law, or are expressly governed by EU law.  However, Spain's domestic laws also continue to apply to investors such as 9REN, and it is clear that the ECT proceedings were concerned with such domestic law issues – not with EU law.

29.     As a matter of policy, it is of course open to the EU to aim at the exclusive application of EU law in an intra-EU investment context.  The EU can ask the Member States not to conclude *inter se* agreements, and to terminate the existing BITs; and it could ensure that multilateral agreements on investment protection do not apply within the European Union, even

---

[41] *See e.g.*, Joined Case C-6/90 and C-9/90 *Francovich and Bonifaci* EU:C:1991:428, **ECF No. 11-5, Hindelang Exhibit 42**.
[42] *See* Spain's Motion to Dismiss at 10, 21, 25.

when they are mixed.  A simple disconnection clause — *i.e.* a clause confirming that the agreement does not create rights and obligations in the relations between the Member States — would achieve that objective. But the ECT does not contain such a clause. The glaring absence of a disconnection clause is striking and undermines the claim that the ECT cannot apply in an intra-EU context.[43]

## IV.   THE *ACHMEA* JUDGMENT AND THE ECT

30.    In this Section, I address whether the *Achmea* Judgment precludes intra-EU arbitration under the ECT.  In my opinion, it does not.  First, the *Achmea* Judgment does not address the ECT.  Second, even if the *Achmea* Judgment were to prohibit intra-EU arbitration under the ECT, that would not affect the consent to arbitration provided by EU Member States in Article 26 of the ECT under international law.   It is international law which governs the jurisdiction of a tribunal established under the ECT.  Therefore, any arbitration agreement formed between an EU Member State and an EU investor under the ECT would still be valid.

31.    My analysis is divided as follows: *First*, I address the scope of the *Achmea* Judgment's findings; *second*, I discuss Opinion 1/17 on CETA, which has clarified the position of investor-State arbitration in EU law; *third*, in light of the findings of both that ruling and the *Achmea* Judgment, I explain my view that intra-EU arbitration under Article 26 of the ECT remains possible under EU law; and *fourth*, I explain why, even if EU law were to preclude intra-EU arbitration, the consent to arbitration provided by EU Member States in Article 26 would remain valid (which is because international law — not EU law — is the applicable law).

---

[43] As another ICSID tribunal observed in *RREEF Infrastructure (G.P.) Ltd. et al. v. Kingdom of Spain*,

> If one or more parties to a treaty wish to exclude the application of that treaty in certain respect or circumstances, they must either make a reservation (excluded in the present case by Article 46 of the ECT) or include an unequivocal disconnection clause in the treaty itself. The attempt to construe an implicit clause into Article 26 of the ECT is untenable.

ICSID Case No. ARB/13/30, Decision on Jurisdiction, June 6, 2016 ¶¶ 84-85, **Exhibit 22**.

A.      **Scope of the ECJ's findings in the *Achmea* Judgment**

32.     The *Achmea* Judgment is one of the latest ECJ rulings in a series in which the ECJ has imposed significant restrictions on the extent to which (a) the Member States can participate in, and (b) the EU can conclude, an agreement setting up systems of international dispute settlement which concern the interpretation or application of EU law.[44]  Those restrictions are aimed at safeguarding what the Court describes as the "autonomy of EU law": An autonomy both from the laws of the Member States and from international law.  This autonomy includes the protection of the essential characteristics of EU law and of the essential powers of the EU institutions.  As far as the ECJ itself is concerned, it has highlighted its own role of ensuring the observance of EU law.[45]  The preliminary rulings system is aimed at guaranteeing such observance, particularly in the laws of the Member States.  Pursuant to Article 267 TFEU any court or tribunal of a Member State may refer questions of interpretation or validity of EU law to the ECJ, and courts or tribunals against whose decisions there is no judicial remedy under national law (*i.e.*, supreme and highest courts) are obliged to refer questions of EU law.  It is further worth noting that the principles of the direct effect and primacy of EU law oblige national courts and tribunals to give domestic effect to EU law.  Next to the preliminary-rulings procedure, Article 344 TFEU instructs the Member States "not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein".

33.     In *Achmea* the ECJ further expanded its case law on the autonomy of EU law.  It is important to highlight that the case concerned a BIT between the Netherlands and Slovakia,

---

[44] *See* in particular Opinion 1/91 *re the EEA Agreement* EU:C:1991:490, **ECF No. 11-3, Hindelang Exhibit 14**; Opinion 1/00 *re the ECAA Agreement* EU:C:2002:231, **ECF No. 11-3, Hindelang Exhibit 15**; Opinion 1/09 *re Unified Patent Convention* EU:C:2011:123, **ECF No. 11-3, Hindelang Exhibit 16**; and Opinion 2/13 *re Accession to the ECHR* EU:C:2014:2454, **ECF No. 11-3, Hindelang Exhibit 17**.
[45] *See* TEU, art. 19(1), **ECF No. 11-3, Hindelang Exhibit 3**.

concluded before Slovakia's accession to the EU; and that Article 8(6) of this BIT provides that the arbitral tribunal "shall decide on the basis of the law", taking into account *inter alia* "the law in force of the Contracting Party concerned" and "any other relevant agreements between the Contracting Parties".

34.    In the *Achmea* Judgment, the ECJ first reiterated a number of general principles and past judicial statements about the autonomy of EU law and the principle of mutual trust.  It then applied those principles to the BIT in issue, and divided its analysis in three parts.

35.    First, and crucially, the ECJ examined whether an arbitral tribunal set up pursuant to Article 8 of the BIT was liable to rule on the interpretation or application of EU law.[46]  It found that EU law is both "the law in force of the Contracting Party" (as EU law is an integral part of the domestic laws of the Member States) and constitutes an agreement between the Parties. It followed that "on that twofold basis the arbitral tribunal … may be called on to interpret or indeed to apply EU law, particularly the provisions concerning the fundamental freedoms, including freedom of establishment and free movement of capital".[47]   This sentence is particularly significant, in light of the differences between the definition of the applicable law in the BIT at issue and that definition in the ECT.  I discuss that difference further below.  Moreover, the insertion of the adverb "indeed" is noteworthy, as it shows that the ECJ was particularly concerned about a non-EU tribunal *applying* EU law to the relations between two Member States, and outside the EU judicial system.  The ECT of course does *not* call for the application of EU internal market law; nor does the Award in issue in this case address EU internal market law in any way.

---

[46] *Achmea* Judgment ¶¶ 39–42, **ECF No. 11-3, Hindelang Exhibit 9**.

[47] *Id.* ¶ 42.

36.     In the second part of its reasoning, the ECJ established that the BIT arbitral tribunal is not situated within the EU judicial system: It is not a court or tribunal of the Member States, capable of making a reference to the ECJ pursuant to Article 267 of the TFEU.[48]

37.     In the third part the ECJ examined to what extent an arbitral award giving effect to the BIT was "subject to review by a court of a Member State, ensuring that the questions of EU law which the tribunal may have to address can be submitted to the Court by means of a reference for a preliminary ruling".[49]   The ECJ established that this was not the case, in light of the limits which German law imposed on such review in the case at hand.   The ECJ concluded by finding that the dispute settlement system of this BIT could not guarantee the full effectiveness of EU law. But the ECJ did not stop there.   It added two further paragraphs, which are crucial for the present case.

38.     First, the ECJ recalled the principle that "an international agreement providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on the institutions, including the [ECJ], is not in principle incompatible with EU law".[50]   The EU's external competence "necessarily entail[s] the power to submit to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions, provided that the autonomy of the EU and its legal order is respected".[51]

39.     Second, and this finding is worth quoting in full:[52]

> In the present case, however, apart from the fact that the disputes falling within the jurisdiction of the arbitral tribunal referred to in Article 8 of the

---

[48] *Id.* ¶¶ 43-49.

[49] *Id.* ¶ 50.

[50] *Id.* ¶ 57.

[51] *Id.*

[52] *Id.* ¶ 58 (emphasis added).

> BIT may relate to the interpretation both of that agreement and of EU law, the possibility of submitting those disputes to a body which is not part of the judicial system of the EU *is provided for by an agreement which was concluded not by the EU but by Member States*. Article 8 of the BIT is such as to call into question not only the principle of mutual trust between the Member States but also the preservation of the particular nature of the law established by the Treaties, ensured by the preliminary ruling procedure provided for in Article 267 TFEU, and is not therefore compatible with the principle of sincere cooperation. . . .

40.     In other words, the ECJ made a clear distinction between intra-EU BITs such as the one in issue in *Achmea*, and a system of dispute settlement set up by an agreement which the EU itself has concluded. That distinction means that the Court sought to confine its ruling to intra-EU BITs between Member States, and did not rule on an agreement like the ECT. It cannot sensibly be argued that, in making that distinction, the ECJ was only considering investment protection agreements between the EU and third countries, and not agreements with intra-EU application: The ECJ's own Advocate General had pointed out in his Opinion in *Achmea* that the ECT applies in an intra-EU context.[53]  The Court was therefore clearly aware of the existence and potential intra-EU application of the ECT and had the opportunity to address it.  It nevertheless distinguished Member State BITs from agreements concluded by the EU.  It is therefore in my opinion wholly incorrect to state, as do Spain and Professor Hindelang, that *Achmea*, "by its terms, applies to any 'international agreement concluded between Member States', including the ECT".[54]  It is further remarkable to see that neither Spain nor Professor Hindelang explains the express distinction which the ECJ made in *Achmea*.

41.     The distinction is in my view explained, not just as an exercise in judicial economy or a desire to confine the ruling to the facts of *Achmea*, but by the ECJ's emphasis on the principle

---

[53] Opinion Advocate General Wathelet in Case C-284/16 *Slowakische Republik v Achmea* EU:C:2017:699 ¶ 43, **Exhibit 23**.
[54] Spain's Motion to Dismiss at 10; Hindelang Decl. ¶ 57.

of mutual trust. Where the Member States set up a system of dispute settlement which sits outside the EU Treaties and is nevertheless capable of interpreting and *indeed applying* EU law, they undermine the principle of mutual trust between them. They undermine the principle that they must trust their respective domestic courts and tribunals to guarantee the full effectiveness of EU law. By contrast, where the EU itself is a contracting party to an agreement, it takes a conscious decision to participate in, and to be bound by a new dispute settlement system. That is not to say that this system cannot be contrary to the autonomy of EU law. However, it does mean that the ruling in *Achmea* cannot be extended to the ECT, in the absence of a further ECJ ruling which is focused on the particular characteristics of that agreement. There are moreover other, highly relevant differences between the *Achmea*-type BIT and the ECT, including, for example, the law applicable to disputes under those treaties. I address those differences below.

42.     It is also important to note that in *Achmea* the ECJ did not declare the Netherlands-Slovakia BIT invalid under international law. What it established was that "Articles 267 and 344 must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the Agreement (…)".[55]  As analysed above, the ECJ's jurisdiction is limited to EU law, and the ECJ fully recognises this in the formulation of its final ruling. The ECJ is incapable of making findings under international law as to the validity of an international agreement between two Member States.

**B.     Opinion 1/17 on CETA and the ECT**

43.     The above analysis of the distinction in *Achmea* between a BIT between Member States to which the EU is not a party, and an investment agreement concluded by the EU, is wholly confirmed and strengthened by the recent ECJ ruling in Opinion 1/17, on the Comprehensive

---

[55] *Achmea* Judgment ¶ 62, **ECF No. 11-3, Hindelang Exhibit 9**.

Economic and Trade Agreement between Canada and the EU (CETA).[56]  That Opinion (pursuant to Article 218(11) TFEU) was requested by Belgium, which raised a number of concerns about the compatibility of CETA's investment protection provisions, and the dispute settlement system which CETA sets up, with EU law.  One of those concerns related to the *Achmea* issue: The extent to which a CETA Tribunal could be called upon to interpret or apply EU law.

44.     Article 8.31 CETA defines the applicable law.  Article 8.31.1 provides that CETA must be applied, "as interpreted in accordance with the Vienna Convention on the Law of Treaties, and other rules and principles of international law applicable between the Parties".  Article 8.31.2 clarifies:

> "The Tribunal shall not have jurisdiction to determine the legality of a measure, alleged to constitute a breach of this Agreement, under the domestic law of a Party. For greater certainty, in determining the consistency of a measure with this Agreement, the Tribunal may consider, as appropriate, the domestic law of a Party as a matter of fact. In doing so, the Tribunal shall follow the prevailing interpretation given to the domestic law by the courts or authorities of that Party and any meaning given to domestic law by the Tribunal shall not be binding upon the courts or authorities of that Party."

45.     Belgium argued that these provisions were inadequate for safeguarding the autonomy of EU law.[57]  It submitted that a CETA Tribunal would still, when ruling on whether an EU measure is compatible with CETA, "be compelled to interpret the effect of that measure", and would not necessarily be able to rely on a previous ECJ interpretation.  Further, a CETA Tribunal would be empowered "to engage in the assessment of issues of substantive law that involve (…) EU primary law".  Belgium further pointed out that a CETA Tribunal could not seek a preliminary ruling from the ECJ.

---

[56] *See supra* note 17.

[57] Opinion 1/17 *re CETA* EU:C:2019:341 ¶ 48, **ECF No. 11-3, Hindelang Exhibit 19**.

46.     The ECJ did not accept Belgium's objections.  Its reasoning shows the limits of its ruling in *Achmea*, in the sense that the ruling does not extend to agreements which the EU itself concludes, with third countries, provided that the tribunals set up by those agreements do not have the power to interpret and apply EU law. As further analysed below, the ECT is in this respect similar to CETA.

47.     In Opinion 1/17 the ECJ first reiterates the relevant principles, revolving around the concept of the autonomy of EU law.  It then accepts that the CETA dispute settlement mechanism "stands outside the EU judicial system".[58]  However, that "does not mean, in itself, that that mechanism adversely affects the autonomy of the EU legal order".[59]

48.     The ECJ starts its analysis of why that is so by pointing out that the jurisdiction of the EU courts and tribunals (the ECJ itself and Member State courts, as referred to in Article 19 TEU) to interpret and apply an agreement concluded by the EU "does not take precedence over either the jurisdiction of the non-Member States with which those agreements were concluded or that of the international courts and tribunals that are established by such agreements".[60]  Even if such agreements may be the subject of preliminary references, "they concern no less those non-Member States and may therefore also be interpreted by the courts and tribunals of those States".[61] The ECJ then adds that it is "precisely because of the reciprocal nature of international agreements and the need to maintain the powers of the Union in international relations that it is open to the Union (…) to enter into an agreement that confers on an international court or tribunal the jurisdiction to interpret that agreement without that court or tribunal being subject to the

---

[58] *Id.* ¶ 113.

[59] *Id.* ¶ 115.

[60] *Id.* ¶ 116.

[61] *Id.* ¶ 117.

interpretations of that agreement given by the courts or tribunal of the Parties".[62] EU law therefore does not preclude the setting up of CETA Tribunals (and indeed the CETA Appellate Tribunal). But on the other hand, "since those Tribunals stand outside the EU judicial system, they cannot have the power to interpret or apply provisions of EU law other than those of CETA or to make awards that might have the effect of preventing the EU institutions from operating in accordance with the EU constitutional framework".[63]  These findings further articulate the ECJ's fundamental acceptance of EU participation in international agreements providing for binding dispute settlement.

49.     In a subsequent section of the Opinion the ECJ establishes that the CETA Tribunals do not have jurisdiction to interpret and apply rules of EU law other than the provisions of CETA itself.[64]

50.     It first points out that a CETA Tribunal does not have jurisdiction to determine the legality of a measure under the domestic law of a Party.[65]  In that respect CETA must be distinguished from the draft agreement which was in issue in Opinion 1/09, which included directly applicable Community law (now EU law) in the applicable law.  It must also be distinguished from the investment agreement at issue in *Achmea*: "that agreement established a tribunal that would be called upon to give rulings on disputes that might concern the interpretation or application of EU law".[66]  And the ECJ also recalls that *Achmea* concerned an agreement between Member States, and this must be distinguished from agreements concluded "between the Union and a non-Member

---

[62] *Id.*

[63] *Id.* ¶ 118.

[64] *Id.* ¶¶ 120–136.

[65] *See* CETA, art. 8.31.2, **Exhibit 19**.

[66] Opinion 1/17 *re CETA* EU:C:2019:341 ¶ 126, **ECF No. 11-3, Hindelang Exhibit 19**.

State".[67]   The principle of mutual trust applies between the Member States, and it implies that Member States accept that all the other Member States comply with EU law, including the right to an effective remedy before an independent tribunal. That principle of mutual trust is not, however, "applicable in relations between the Union and a non-Member State".[68]

51.     The ECJ then accepts the limitations which CETA places on the extent to which a CETA Tribunal may take the domestic law of the Parties (and therefore EU law) into account.[69] The relevant section is worth quoting in full:[70]

> Those provisions serve no other purpose than to reflect the fact that the CETA Tribunal, when it is called upon to examine the compliance with the CETA of the measure that is challenged by an investor and that has been adopted by the investment host State or by the Union, will inevitably have to undertake, on the basis of the information and arguments presented to it by that investor and by that State or by the Union, an examination of the effect of that measure.

> That examination may, on occasion, require that the domestic law of the respondent Party be taken into account. However, as is stated unequivocally in Article 8.31.2 of the CETA, that examination cannot be classified as equivalent to an interpretation, by the CETA Tribunal, of that domestic law, but consists, on the contrary, of that domestic law being taken into account as a matter of fact, while that Tribunal is, in that regard, obliged to follow the prevailing interpretation given to that domestic law by the courts or authorities of that Party, and those courts and those authorities are not, it may be added, bound by the meaning given to their domestic law by that Tribunal.

52.     The ECJ further finds that, as the jurisdiction of the CETA Tribunals and Appellate Tribunal is limited to the interpretation of CETA, no provision needs to be made for preliminary references to the ECJ.[71]   It also finds that it is consistent with EU law for CETA not to allow for

---

[67] *Id.* ¶ 127.

[68] *Id.* ¶ 129.

[69] *See* CETA, art. 8.31.2, **Exhibit 19**; *see supra* ¶ 44.

[70] Opinion 1/17 *re CETA* EU:C:2019:341 ¶ 131, **ECF No. 11-3, Hindelang Exhibit 19**.

[71] *Id.* ¶ 134.

any re-examination of awards by domestic courts (including the ECJ), and not to allow the investor to bring parallel or subsequent proceedings before such courts.[72]

53.    The ECJ subsequently analyses other objections against CETA, discarding all of them, but those parts of the Opinion are less relevant to the issues that arise in the present proceedings.

54.    The ECT is analogous to CETA in the following respects.

55.    First, the ECT is, like CETA, an agreement between the EU and one or more third countries.  The ECT and CETA are both mixed agreements, with the EU and the Member States as contracting parties.  There is a difference as well here, because CETA is an essentially bilateral agreement, "between Canada, of the one part, and the European Union and its Member States, of the other part".[73]  I have been conscious of that in drawing conclusions from the ECJ's Opinion. Opinion 1/17 cannot be read as being confined to an agreement such as the one with Canada, which does not have intra-EU application.  What the ECJ did was to distinguish between *Achmea*, which "concerned (…) an agreement between Member States" and "an agreement between the EU and a non-Member State".[74]  The ECT is in the latter category.

56.    Second, the ECT defines the applicable law in an analogous way.  Article 26(6) ECT makes no reference whatsoever to the domestic laws of the Parties, nor to other treaties or agreements applicable between the Parties.  Its formulation is more succinct than the CETA provisions, but the underlying principle is clearly the same: The jurisdiction of an ECT tribunal is limited to interpreting and applying the ECT. That follows from the phrase: "shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law".

---

[72] *Id.* ¶ 135.

[73] Council Decision (EU) 2017/37 of 28 October 2016, **Exhibit 20**; *see supra* note 34; *see also supra* ¶ 24.

[74] Opinion 1/17 *re CETA* EU:C:2019:341 ¶ 127, **ECF No. 11-3, Hindelang Exhibit 28**.

The "issues in dispute" are, according to Article 26(1), investment disputes "concerning an alleged breach of an obligation (…) under Part III" of the ECT.  EU law says nothing on the interpretation of the obligations under Part III of the ECT.  The only rules and principles of international law "applicable" to determining a dispute under the ECT are general principles and customary rules of international law, such as the customary international law rules on treaty interpretation.  EU law also cannot have been intended to form part of the "applicable rules and principles of international law", because it is not binding on the non-EU Contracting Parties to the ECT.

57.    These analogies are crucial for the present proceedings.  It is in my opinion most likely that, if the ECJ were ever asked whether the ECT provisions on investment arbitration are compatible with EU law, its answer would be affirmative because of those analogies.  I explore this in the following subsection.

### C.    Article 26 of the ECT is Valid as a Matter of EU Law

58.    The ECJ judgment in *Achmea* establishes that arbitration provisions in BITs between Member States "such as" Article 8 of the Netherlands-Slovakia BIT are contrary to EU law.  The judgment applies *erga omnes*, and courts and tribunals in the EU Member States need to give effect to this finding, in any cases involving such BITs.  However, the ECJ clearly distinguished these kinds of BITs, which do not have the EU itself as a contracting party, from agreements which do.  The clear and express distinction which the ECJ made in *Achmea* is confirmed by Opinion 1/17, in which it accepted the lawfulness of the CETA dispute settlement system.  CETA is a mixed agreement, like the ECT.

59.    To this date, the ECJ has not been asked to rule on the validity of the act by which the EU concluded the ECT.  Acts of the EU institutions can be annulled or declared invalid only

by the EU General Court and by the ECJ.[75]  Annulment actions need to be brought within a two-month period after the adoption of the pertinent act or law,[76] and that period has obviously expired in the case of the Council Decision concluding the ECT.[77]  However, any court or tribunal of a Member State may at any time ask the ECJ whether a particular act is invalid, and the ECJ could therefore still be requested to rule on the validity of the ECT under the EU Treaties.  But it is vital to add that in the *Foto-Frost* judgment the ECJ established that it has sole authority to declare an EU act invalid; Member State courts cannot make such a declaration.[78]  There is therefore a presumption of validity afforded to acts of the EU in any proceedings before courts in the EU Member States, and it is only once the ECJ has declared the relevant EU act invalid (in this case the act through which the EU Council concluded the ECT) that Member State courts may proceed on the basis that there is an incompatibility between the agreement in issue (here the ECT) and EU law.  It is in my opinion most remarkable that, in the present proceedings, this Court in a non-EU Member State is effectively asked to do what a court in a Member State could never do, on its own: To rule on the invalidity of the ECT under EU law.

60.    The above means that there is no judicial authority whatsoever, in EU law, in support of the proposition that the ECT investment arbitration provisions are invalid in so far as intra-EU investments are concerned, or that such provisions are precluded.

---

[75] The General Court (the "GC") has jurisdiction over certain types of direct actions for annulment; its judgments can be appealed to the ECJ. Together the GC and the ECJ form the Court of Justice of the European Union ("CJEU") (although there is variable use of this terminology: the abbreviation CJEU is often used for the ECJ).

[76] *See* TFEU, art. 263, **ECF No. 11-3, Hindelang Exhibit 4**.

[77] *See* Council and Commission Decision on the conclusion, by the European Communities, of the Energy Charter Treaty and the Energy Charter Protocol on energy efficiency and related environmental aspects EU [1998] OJ L 69, at 1, **Exhibit 24**.

[78] Case 314/85 *Foto-Frost* EU:C:1987:452, **Exhibit 25**.

61.     How the ECJ would rule on the validity of the ECT's provisions on investment arbitration, in so far as they apply between Member States, is a matter of conjecture.  In my opinion, the Court would be most unlikely to issue a ruling of invalidity, for the following reasons.

62.     First, the ECT defines the applicable law in essentially the same way as does CETA. ECT investment disputes do not extend to any violations of EU law, because the ECT does not include agreements between the parties, or the parties' domestic law, in the applicable law.[79]  An ECT tribunal must therefore treat EU law in the same way as a CETA Tribunal: As a factual matter. This is confirmed by the reference, in Article 26(6) ECT, to "the issues in dispute", which constitutes a cross-reference to Article 26(1), which is limited to "breach of an obligation under Part III", *i.e.*, the ECT provisions on Investment Promotion and Protection.[80]  As explained above, EU law is not relevant to the determination of whether there has been a violation of Part III of the ECT.

63.     Tribunals have indeed looked at EU law in cases where their very jurisdiction was challenged.[81]  It cannot be the case, however, that a challenge to a tribunal's jurisdiction as being contrary to EU law is sufficient to conclude that any decisions by such a tribunal violate EU law, because they interpret or apply it.  That would mean that, in any investment cases involving the EU or any of its Member States, it would be sufficient for these parties to challenge the tribunal's jurisdiction as being contrary to EU law for such a violation becoming the necessary outcome.

---

[79] I leave to one side the question whether, even if this finding were wrong, any use of "agreements between the parties" would need to be construed as the parties to the ECT rather than the parties to the dispute.  In the former case, the EU Treaties would of course not constitute applicable law either, as they do not bind the ECT Contracting Parties that are not EU Member States.

[80] *See* the reasoning of the tribunal in *Vattenfall AB v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the Achmea Issue (Aug. 31, 2018) ¶ 116, **Exhibit 26**.

[81] *See* the Award in issue in this case.

Such jurisdictional circularity or tautology can never be a good-faith interpretation of the relevant international law provisions.

64.     Moreover, and in line with the analysis above, there is in my opinion no inherent or necessary incompatibility between the ECT provisions, on the one hand, and EU internal market and EU energy law, on the other.  Both sets of provisions aim at free and open markets, and at undistorted competition.  Spain and Professor Hindelang are unable to point to any actual conflicts. Spain suggests that the investment benefits which 9REN received in Spain, prior to the challenged Spanish measures which curtailed those benefits, constituted unlawful State aid.[82]  However, the EC never issued a State aid decision on the 2007 Spanish regime.  It is only in its State aid decision on the 2014 regime that the EC included some observations, not on the 2007 regime, but on arbitral awards that may be rendered under the ECT as a result of the modification of that regime.[83]  For the reasons set out below,[84] those observations are wholly inadequate, and do not constitute a proper EC State aid decision.

65.     Nor is there an inherent or necessary incompatibility between the remedies available under the ECT and those which EU law offers.  As mentioned above, EU investors may claim damages for a Member State's sufficiently serious breach of EU law, including the TFEU provisions on the right of establishment or the free movement of capital.  An ECT Tribunal may of course also award compensation.  It is moreover remarkable that Professor Hindelang points out, rightly, that even the European Court of Human Rights ("ECtHR") may award compensation in an investment case.[85]  The ECtHR is not an EU institution, and the convention which it enforces

---

[82] Spain's Motion to Dismiss at 14-15.

[83] EC, State Aid SA.40348 (2015/NN) – Spain – Support for electricity generation from renewable energy sources, cogeneration and waste, C(2017)7384 final, **ECF No. 11-6, Hindelang Exhibit 59**.

[84] *See infra* section VI.

[85] Hindelang Decl. ¶¶ 41-42.

has been concluded by the EU Member States, together with non-Member States, but not by the EU itself.  Professor Hindelang therefore appears to accept intra-EU investment dispute settlement in Strasbourg, but not in the framework of the ECT, notwithstanding the fact that the EU is itself an ECT Contracting Party, and is not a party to the European Convention on Human Rights.

66.     There is also no incompatibility between the ECT and EU State aid law, as Spain and the EC suggest. [86]  The thesis that an international arbitral award that compensates an investor for not having received fair and equitable treatment may constitute a State aid has been firmly rejected by the EU General Court, in a judgment which articulates the requirements which need to be satisfied in order for an arbitral award to constitute State aid.[87]  Specifically, the General Court confirmed an older ECJ judgment, *Asteris and Others*.  In that judgment the ECJ stated that "State aid, that is to say measures of the public authorities favouring certain undertakings or certain products, is fundamentally different in its legal nature from damages which the competent national authorities may be ordered to pay to individuals in compensation for the damage they have caused to those individuals".[88]  The General Court built on this finding, by establishing that "compensation for damage suffered cannot be regarded as aid unless it has the effect of compensating for the withdrawal of unlawful or incompatible aid".  There is no suggestion in this case that Spain withdrew unlawful or incompatible aid.

67.     Nor is it easy to see in what way the non-applicability of the ECT in an intra-EU context would make sense from the perspective of avoiding any conflicts between the ECT's investment protection provisions and EU law. The ECT would continue to bind the EU and its

---

[86] *See* Spain's Motion to Dismiss at 15.

[87] Case T-624/15 *European Food and Others v Commission* EU:T:2019:423, ¶ 104-106, **ECF No. 11-7, Hindelang Exhibit 61**.

[88] Joined Cases 106 to 120/87 *Asteris v Greece* EU:C:1988:457 ¶ 23, **Exhibit 27**.

Member States in relation to claims by investors from non-EU Contracting Parties. Those claims could be identical to any intra-EU claims. The nationality of an investor plays no role here. Moreover, an investor from an EU Member State, such as a company which has invested in another Member State, may well be owned or controlled by a national from a non-EU ECT Contracting Party. To illustrate this further, if the Plaintiff were owned or controlled by such a non-EU national from an ECT Contracting Party, any claims by the latter investor would presumably not come within the intra-EU non-application — even if, in substance, the claim would be identical to the one which led to the present Award.

**D.      Under International Law, Article 26 ECT Is Valid Regardless Of Whether It Complies With EU Law**

68.      Even if there were a conflict between the EU Treaties and the ECT (which, as I have explained above, there is not), that would not affect the validity of an EU Member State's offer to arbitrate under Article 26(3) of the ECT. First, as I have explained, the *Achmea* ruling cannot change the fact that the ECT is still in force.

69.      Second, EU law cannot affect the application of the offer to arbitrate extended by the Contracting Parties to the ECT in Article 26(3) of that treaty. EU law is simply not applicable to that offer. As explained above, the applicable law provision in the ECT (Article 26(6)) does not address EU law. Even if it did, however, it is relevant only to the determination of the "issues in dispute" which, as I have also noted, constitutes a cross-reference to Article 26(1), and, as such, is limited to "breach of an obligation under Part III", *i.e.*, the ECT provision on Investment Promotion and Protection. Article 26(3) is in Part V of the ECT, on the Settlement of Disputes between an Investors and a Contracting Party. Article 26(6) therefore has no relevance to it. [89]

---

[89] In the absence of any relevant choice of law clause, any questions regarding the interpretation of Article 26 would be considered applying international law principles of treaty interpretation.

70.     Third, in the event of any conflict between the ECT and EU law (deriving from the EU Treaties), the ECT would prevail.

71.     Customary international law rules govern the resolution of conflicts between treaties. These are enshrined in Article 30 of the VCLT. The general rule is: (i) that the provisions of the later treaty prevail (the *lex posterior* principle), [90] unless (ii) the treaties themselves indicate which one should take precedence. [91] In the case of the ECT and EU Treaties it is difficult to see how this rule could favour the EU Treaties. The ECT contains an express conflict rule in Article 16(2), which states that where two or more Contracting Parties have entered into another treaty, whose terms "*concern the subject matter of Part III or V of this Treaty*", the terms of Part III and Part V prevail, provided they are "*more favourable to the Investor or Investment*." As explained above, I disagree that the EU Treaties (or EU law) conflict with Part III or Part V of the ECT (i.e. that there is subject matter coincidence). If Spain were correct as to its interpretation of the *Achmea* Judgment, and there was such a conflict, EU law is clearly not more favourable to the investor, as it removes the opportunity for intra-EU arbitration.

72.     Spain argues that "[i]n case of conflict between a rule created by an EU Member State and EU law, EU law takes precedence and overrides such a rule by application of the fundamental principle of primacy of EU law."[92] However, there is no rule that EU law prevails, or has primacy, over treaties concluded between EU Member States. Even if there were, it would not take precedence over Article 16 of the ECT. Both Spain[93] and Professor Hindelang[94] argue

---

[90] VCLT, arts. 30(3), 30(4)(a), **ECF No. 11-4, Hindelang Exhibit 32**.

[91] *Id.*, art. 30(2).

[92] Spain's Motion to Dismiss at 4.

[93] *Id.* 4.

[94] Hindelang Decl. ¶ 26.

that EU law prevails, or has primacy, over treaties concluded between EU Member States.  There
is, however, no authority for that proposition.

73.     *First*, the ECJ has never used the term "primacy" for any such conflicts.  As
described above, the ECJ's jurisdiction is limited to matters of EU law.  All parties in these
proceedings agree that the EU Treaties form part of international law, even if according to the ECJ
they set up an autonomous legal order.  The ECJ is the ultimate interpreter of those Treaties, and
needs to ensure that they are properly enforced.  But the ECT does not give the ECJ jurisdiction to
rule on any conflicts between its provisions and the EU Treaties, under international law, as
opposed to EU law.  The ECJ is, for the purpose of interpreting and applying the ECT, simply not
an international court.  It has the function of a supreme domestic court, no more.  It is, for purposes
of the ECT, the highest court of one of the Contracting Parties, not the court tasked with enforcing
the treaty between the Contracting Parties.

74.     The ECJ has never, to the best of my knowledge, made any statements to the
opposite effect – in relation to the ECT, or to any other agreement to which the EU is a party, or
to any agreements between EU Member States. It has in fact confirmed the limits on its own
jurisdiction, in the seminal *Kadi* case, on the relationship between the UN Charter and EU law.
That case (which, as I mentioned above, I was involved in) concerned a UN Security Council
Resolution, imposing sanctions on Mr. Kadi *post* 9/11, for purposes of counterterrorism.  The ECJ
established that Mr. Kadi's fundamental rights under EU law had been violated by the EU's
attempt to implement the sanctions.  Crucially, however, it stated that "any judgment given by the
Community judicature deciding that a Community measure intended to give effect to such a [UN]
resolution is contrary to a higher rule of law in the Community legal order would not entail any

challenge to the primacy of that resolution in international law".[95]  Instead, the ECJ characterizes any conflicts between a Member State's international commitments and EU law as a breach of EU law, thereby imposing on the relevant Member State an obligation to remove that breach,[96] for example by renegotiating the agreement or denouncing it.

75.     *Second*, that the "principle of the primacy of EU law" (which does exist as a principle under EU law) is exclusively concerned with the relationship between EU law and the *domestic* laws of the Member States is clear from the block citation from *Simmenthal II* provided in Professor Hindelang's opinion.[97]

76.     Neither Professor Hindelang nor Spain points to any international law authorities for their proposition that the primacy of EU law is a conflict rule applicable to resolve conflicts between treaties to which EU Member States are parties.[105]

77.     Indeed, the authorities cited by Professor Hindelang fully recognize that the EU is bound by international law.  Article 216(2) TFEU provides that international agreements are binding on the EU institutions and on the Member States.  Article 218(11) recognizes that, in case of a conflict between an envisaged international agreement and the EU Treaties, either the agreement must not be concluded, or the Treaties must be amended.  That provision would be unnecessary if EU law had primacy over an incompatible agreement.  Article 351 TFEU recognizes that Member State agreements predating their accession take priority over incompatible EU law.[98]  The *Germany v Council* judgment established an incompatibility

---

[95] *Kadi* ¶ 288, **ECF No. 11-3, Hindelang Exhibit 7**.

[96] *See supra* ¶¶ 13-14.

[97] Hindelang Declaration ¶ 22, referring to *Simmenthal II*.

[98] It may be noted that the EU Treaties do not contain any provisions regulating the relationship between Member State agreements postdating their accession.  That however does not mean that the EU Treaties have primacy over such agreements.

between a WTO protocol on trade in bananas and EU law; but the protocol was renegotiated in recognition of the fact that the incompatibility had to be removed, and that EU law could not simply prevail on the international plane.[99]

### E.     The Achmea Judgment Did Not Have a Direct Legal Effect on the Parties' Agreement to Arbitrate

78.    I understand that no court has held that the arbitration agreements at issue in this case are void, or that they may not be performed, and without such a holding, the agreements to arbitrate remain valid.  While the ECJ has jurisdiction to rule on an issue of EU law placed before it, it does not have the power to "invalidate" a contract.  This is because preliminary rulings by the ECJ differ from rulings by American federal appellate courts in that they are not decisive of the outcome of the disputes before the ECJ.  Instead, the ECJ rules on a question of EU law put before it and leaves it to the national court that referred the question of EU law to: (a) determine whether the case at hand actually meets the criteria laid down by the CJEU and (b) establish the relevant facts in the case before applying the ECJ decision to those facts and issuing a judgment that binds and determines the rights of the parties.

### F.     Conclusion: The *Achmea* judgment has no effect on the validity of the Parties' arbitration agreement

79.    For the reasons explained above, I do not consider that the *Achmea* Judgment has any bearing on intra-EU arbitration under the ECT.  As such, it has no effect on the validity of the arbitration agreement concluded between 9REN and Spain, and therefore on the enforcement of the Award which is the subject of these proceedings.

80.    To my knowledge, 28 ECT arbitral tribunals to date have addressed the "intra-EU" objection and examined in detail whether Article 26 of the ECT excludes arbitration between

---

[99] Case C-122/95 *Germany v Council* EU:C:1998:94, **Exhibit 6.**

investors of an EU Member State and another EU Member State.  Each of these tribunals, with no exception, has rejected the position taken by Spain and Professor Hindelang in this case.

## V.    THE EC'S COMMUNICATION AND THE FIRST DECLARATION HAVE NO EFFECT ON THE ECT'S INTERPRETATION

81.    In this section, I address the effect, if any, that the following two communications have on the interpretation to be given to the ECT:

(i)    the EC's Communication issued to the European Parliament and European Council on 19 July 2018 on intra-EU investment.[100]  In that communication, the EC expressed its opinion that the reasoning of the ECJ in the *Achmea* Judgment applied to the dispute resolution clause of the ECT;[101]  and

(ii)    the First Declaration, which was signed on 15 January 2019 by twenty-two EU Member States concerning the consequences of the *Achmea* Judgment.[102]  The First Declaration expressed the view that, in light of the *Achmea* Judgment, were the ECT to contain an investor-State arbitration clause applicable between Member States, it "*would have to be disapplied*",[103]  The twenty-two EU Member States agreed to inform tribunals in all pending intra-EU investment arbitration proceedings under the ECT of that position.[104]  In addition, they agreed to "*discuss without undue delay whether any additional steps are necessary to draw*

---

[100] Communication from the Commission to the European Parliament and the Council: Protection of intra- EU investment, COM(2018)547 final, 19 July 2018, **ECF No. 11-6, Hindelang Exhibit 51**.

[101] *Id*. at 4.

[102] Declaration of the Representatives of the Governments of the Member States on the Enforcement of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union (15 January, 2019), **ECF No. 11-5, Hindelang Exhibit 45**.

[103] *Id*. at 2.

[104] *Id*. at 3 ¶ 1.

*consequences from the Achmea judgment in relation to the intra- EU application of the Energy Charter Treaty*".[105]

82.　For the reasons explained above, I consider the views expressed in the EC's Communication and the First Declaration to go far beyond the ECJ's findings in the *Achmea* Judgment.[106]  I have seen that Spain claims that those views must be given effect.[107]  I understand Spain's argument to be that, in light of the EC's Communication and the First Declaration, intra-EU arbitration under the ECT should be interpreted as being precluded.  I disagree with that proposition.  In my opinion, the EC's Communication and the First Declaration have no such effect.[108]

83.　The views of State signatories to a treaty on the interpretation of that treaty may be taken into account in the interpretation of a treaty.[109]  However, they need to be agreed by all the parties to that treaty.[110]

84.　Neither the EC's Communication nor the First Declaration represent interpretative declarations on the ECT agreed by all parties to the ECT.  The EC's Communication is nothing more than a position paper, presenting the EC's opinion on the *Achmea* Judgment to other organs

---

[105] *Id*. at 4 ¶ 9.

[106] This was also the finding of the tribunal in *Eskosol*.

[107] Spain's Motion to Dismiss at 23-24.

[108] Spain cites various United States authorities in support of its analysis. I am not qualified to comment on those. My view is from the perspective of international and EU law.

[109] Pursuant to customary international law rules of treaty interpretation, as enshrined in VCLT, Articles 31(2) and 31(3)(a). It remains, however, only a factor to be considered in the treaty's interpretation. See, Report of the International Law Commission (ILC) A/66/10/Add.1, addressing the ICL's 2001 Guide to Practice on Reservations to Treaties, at 560, **Exhibit 28**.

[110] VCLT, arts. 31(2), 31(3)(a), **ECF No. 11-4, Hindelang Exhibit 32**.  *See also* ILC 2001 Guide to Practice on Reservations to Treaties ¶ 4.7.3 ("An interpretative declaration that has been approved by all the contracting States and contracting organizations may constitute an agreement regarding the interpretation of the treaty."), **Exhibit 28**.

of the EU.  It does not even represent the view of one Contracting Party to the ECT,[111] let alone all the Contracting Parties.

85.     The First Declaration is of the same nature as the EC's Communication.  It presents the views of a group of EU Member States on the *Achmea* Judgment.  It has not been agreed by all EU Member States,[112] let alone all parties to the ECT.  Accordingly, neither the EC's Communication nor the First Declaration is relevant in interpreting the ECT.[113]

## VI.     PAYMENT OF THE AWARD WOULD NOT VIOLATE EU LAW

86.     Spain claims that the Award in issue before this Court constitutes unlawful State aid,[114] and that as such Spain is prohibited by EU law from paying it without authorisation from the EC.  Professor Hindelang supports that claim.[115]  I disagree.  In order to constitute unauthorized State aid, the Award must first constitute State aid which requires authorization.  There is no authority confirming that that is the case, nor could there be because the Award does not meet the definition of a State aid under EU law.

87.     Spain and Professor Hindelang refer to the Commission's State aid decision concerning the 2014 support scheme for electricity generation from renewable energy sources,

---

[111] The EU is a party to the ECT, the EC (which is merely an organ of the EU) is not.

[112] Indeed, I am aware that six other EU Member States have issued declarations on the *Achmea* Judgment in which they have either declined to comment on its significance for the ECT, or rejected any significance entirely.  *See* **ECF No. 11-6, Hindelang Exhibits 46, 47** (declarations of Sweden, Luxembourg, Finland, Malta, Slovenia, and Hungary).

[113] As regards the First Declaration, the same view was expressed by the tribunal in *Eskosol S.p.A. in liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Decision on Termination Request and Intra-EU Objection ¶¶ 219–221, **Exhibit 29**.  As the tribunal did in that case, I also question whether the First Declaration could properly be construed as presenting an interpretation of the ECT in any event.  I do not need  to consider that issue, however, since the fact that the First Declaration is not agreed by all members of the ECT is sufficient to conclude that it has no bearing on the ECT's interpretation.  The *Eskosol* tribunal was not required to address the EC's Communication.

[114] Spain's Motion to Dismiss at 29-30.

[115] Hindelang Decl. ¶¶ 58-66.

cogeneration and waste in Spain (hereafter the Decision).[116]  That Decision cannot, however, be construed as authority for their position.  The part cited is not binding under EU law and contains no reasoning for the position advanced.  Furthermore, applying principles established in a recent judgment of the EU General Court, one can only find that the Award does not constitute State aid requiring notification to the Commission.

88.     The Decision, as its name indicates, concerned the 2014 support scheme for electricity generation from renewable energy sources, cogeneration and waste in Spain.  In it, the Commission found the 2014 scheme to be aid which is compatible with the internal market pursuant to Article 107(3)(c).[117]  However, it also opined about any awards which arbitral tribunals could potentially issue in relation to the 2007 scheme (*not* the 2014 scheme which was the object of the Decision), under either the ECT or under intra-EU BITs (*e.g.*, in cases such as *9REN*).  At the time of the Decision no awards had been made yet.  Nevertheless, the Commission concluded that "any compensation which an Arbitration Tribunal were to grant to an investor on the basis that Spain has modified the premium economic scheme [*i.e.*, the 2007 scheme] would constitute in and of itself State aid" and "would be notifiable . . . pursuant to Article 108(3) TFEU."[118]  That is the part of the Decision relied on by Spain  and Professor Hindelang.[119]

89.     Spain suggests that this statement in the Decision is binding.[120]  That is wrong as a matter of EU law.  The Decision is binding in so far as it relates to the 2014 scheme.  The comments made regarding arbitral awards are not, since they do not comply with EU State aid rules.

---

[116] Spain's Motion to Dismiss at 14-15; Hindelang Decl. ¶ 61, referring to European Commission Decision 2017/7384, State aid Case SA.40348 – Spain: Support for electricity generation from renewable energy sources, cogeneration and waste, Nov. 10, 2017, C(2017) 7384 final, **ECF No. 11-6, Hindelang Exhibit 59**.

[117] Art. 107(3)(c) covers "aid to facilitate the development of certain economic activities or of certain economic areas, where such aid does not adversely affect trading conditions to an extent contrary to the common interest".

[118] Decision ¶ 165.

[119] *See* Spain's Motion to Dismiss at 30; Hindelang Decl. ¶ 61.

[120] Spain's Motion to Dismiss at 30.

90.     Articles 107 to 109 TFEU contain the basic provisions governing EU State aid policy.   Article 107(1) declares that "[s]ave as otherwise provided in the Treaties, any aid granted by a Member State or through State resources in any form whatsoever which distorts competition by favouring certain undertakings or the production of certain goods shall, in so far as it affects trade between Member States, be incompatible with the internal market".   Article 107(2) and (3) define certain types of aid which, respectively, "shall be compatible with the internal market" and "may be considered to be compatible with the internal market".   Article 108 lays down the essence of the powers of the Commission as regards State aids. Article 108(3) provides that the Commission must be informed by Member States "of any plans to grant or alter aid". If the Commission "considers that any such plan is not compatible with the internal market (…) it shall without delay initiate the procedure provided for in paragraph 2".   The latter provides that "[i]f, after giving notice to the parties concerned to submit their comments, the Commission finds that aid granted by a State or through State resources is not compatible with the internal market (…) it shall decide that the State concerned shall abolish or alter such aid within a period of time to be determined by the Commission".   Further detail on this review procedure can be found in EU Regulation 2015/1589.[121]

91.     It is clear that, in so far as it addressed arbitral awards under the ECT, the Decision was not adopted in accordance with Article 108 TFEU and Regulation 2015/1589.   There was, at the time of the Decision, no "aid granted" (Article 108(2) TFEU) by virtue of an arbitral award.   The Commission has no authority to issue State aid decisions in purely hypothetical cases.

---

[121] Council Regulation (EU) 2015/1589 of 13 July 2015, laying down detailed rules for the application of Article 108 of the Treaty on the Functioning of the European Union [2015] EU OJ L 248, at 9, **Exhibit 30**.

92.     The Decision is, in any case, wrong that the Award constitutes State aid requiring authorization. Notably, the Decision did not provide any analysis of the issue.[122]   Professor Hindelang has sought to justify it by reference to the Commission decision on another arbitration award in the case of *Micula v Romania*.[123]   The circumstances underlying that decision would make it inapposite in these proceedings.  It is not necessary to go into detail on that, however, since in any case, the decision has been recently annulled by the EU General Court, in a judgment which articulates the requirements which need to be satisfied in order for an arbitral award to constitute State aid.[124]

93.     Specifically, the GC confirmed an older ECJ judgment, *Asteris and Others*.[125]   The GC built on this judgment, by establishing that "compensation for damage suffered cannot be regarded as aid unless it has the effect of compensating for the withdrawal of unlawful or incompatible aid."   The GC noted that, in its impugned decision, the Commission had indicated its awareness of that principle.  However, the GC held that it had been applied incorrectly, because there was no authority for the fact that the measure in respect of which compensation  was allegedly granted in fact constituted State aid (indeed, it could not have done, because the measure was in place before the relevant State entered the EU, *i.e.*, before that State become subject to EU State aid law).[126]

94.     This judgment, therefore, establishes two principles.  First, it is only where an arbitral award compensates for unlawful or incompatible State aid that it comes within EU State

---

[122] Decision ¶ 165.

[123] Hindelang Decl. ¶ 62, referring to EC Decision 2015/1470.

[124] European Commission Decision 2015/1470, State aid Case SA.38517 – Arbitral Award, Micula v. Romania of 11 December 2013, Mar. 30, 2015, 2015 O.J. (L 232) 43, **ECF No. 11-7, Hindelang Exhibit 60**.

[125] Joined Cases 106 to 120/87 Asteris v Greece EU:C:1988:457 ¶ 23, **Exhibit 27**.

[126] *European Food and Others* ¶¶ 104–106, **ECF No. 11-7, Hindelang Exhibit 61**.

aid law.  Second, the Commission cannot simply assume that the State measures, the cancellation

of which are compensated through an award, constitute State aid.  It needs to show this.  Both these

principles need to be complied with, and that is not the case in so far as this Award is concerned.

First, the award does not offer compensation directly equivalent to the benefits that 9REN's

subsidiaries would have received under the 2007 regime (*i.e.*, it does not compensate for State aid).

It provides for compensation to 9REN reflecting the losses it has suffered as a result of Spain's

breach of its obligations under Article 10(1) of the ECT.[127]  Secondly, even if the Award did

compensate for withdrawn State aid, there has never been any ruling that the 2007 regime

constituted unlawful or incompatible State aid (indeed, the 2007 regime has never been reviewed

under EU State aid law at all).[128]  Accordingly, there is no basis for concluding that the Award is

notifiable State aid.[129]

## VII.   THE AWARD IS IMMEDIATELY ENFORCEABLE

95.     If, notwithstanding the position above, the Award were to constitute unauthorized

State aid, I do not follow at all Spain's position that this would mean the tribunal rendered an

"*ultra vires* Award."[130]  First, I do not agree with Spain's argument that the Tribunal's

jurisdiction was restricted by EU law, for the reasons explained above.  Second, even if it were,

and the Tribunal had acted "*ultra vires*," that would not render the Award void.  It may mean the

Award could be subject to an application for annulment under Article 52(1)(b) of the

---

[127] Award ¶ 14.

[128] This Court is, in effect, being asked, in a case on the enforcement of an ICSID Award, to be the first judicial or other authority to rule on whether either the Award or the 2007 regime constitutes unlawful State aid.

[129] In addition, the *travaux préparatoires* of the ECT also makes clear that Contracting Parties to the ECT cannot invoke provisions of their internal law as justification for failing to perform a treaty.  European Energy Charter Conference Secretariat, Note from the Secretariat, 42/94, CONF 115 (Jan. 6, 1995), Annex 1 ("Note of Chairman"), **Exhibit 31** (recalling the EEC's request to include an explanatory note that no ECT "party may not invoke the provisions of its internal law as justification for its failure to perform").

[130] Spain's Motion to Dismiss at 30.

Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the "ICSID Convention") (on the basis that the Tribunal had manifestly exceeded its powers).  Whether or not that application was valid would, however, be for the determination of an ICSID *ad hoc* committee constituted under Article 52 of the ICSID Convention.  Unless and until such a determination is made by an ICSID *ad hoc* committee, the Award remains binding on the parties under ICSID Article 53(1).

96.     I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed on February 14, 2020 in London, United Kingdom.

_____
Piet Eeckhout

**Index of Exhibits for Expert Opinion of Professor Piet Eeckhout**

| Ex. | Description |
|-----|-------------|
| 1. | CV of Professor Piet Eeckhout |
| 2. | Case C-621/18 *Andy Wightman and Others v Secretary of State for Exiting the European Union* EU:C:2018:999 |
| 3. | Case C-344/04 *The Queen ex parte IATA v Department for Transport* EU:C:2006:10 |
| 4. | Case C-308/06 *Intertanko* EU:C:2008:312 |
| 5. | Case 181/73 *Haegeman* EU:C:1974:41 |
| 6. | Case C-122/95 *Germany v Council* EU:C:1998:94 |
| 7. | Case C-327/91 *France v Commission* EU:C:1994:305 |
| 8. | Opinion 1/75 *re Understanding on a Local Cost Standard* EU:C:1975:145 |
| 9. | Case C-648/15 *Austria v Germany* EU:C:2017:664 |
| 10. | Case C-205/06 *Commission v Austria* EU:C:2009:118 |
| 11. | Case C-249/06 *Commission v Sweden* EU:C:2009:119 |
| 12. | Case C-118/07 *Commission v Finland* EU:C:2009:715 |
| 13. | Opinion of Mischo AG in Case C-62/98 *Commission v Portugal* EU:C:1999:509 |
| 14. | P. Eeckhout, EU External Relations Law (2nd ed, Oxford University Press 2011) |
| 15. | Opinion of Warner AG in Case 34/79 Henn and Darby EU:C:1979:246 |
| 16. | Case C-66/13 *Green Network SpA* EU:C:2014:2399 |
| 17. | Opinion 2/15 *re EU-Singapore FTA* EU:C:2017:376 |
| 18. | M Cremona, "Disconnection Clauses in EU Law and Practice", in C Hillion and P Koutrakos (eds), *Mixed Agreements Revisited* (Oxford and Portland, Oregon: Hart Publishing, 2010) |
| 19. | Comprehensive Economic and Trade Agreement (CETA) |

| Ex. | Description |
|---|---|
| 20. | Council Decision (EU) 2017/38 of 28 October 2016 on the signing on behalf of the European Union of the Comprehensive Economic and Trade Agreement (CETA) between Canada, *of the one part*, and the European Union and its Member States, *of the other part* (EU OJ 2017 L 11 at 1, italics added) |
| 21. | *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Award, 25 November 2015 |
| 22. | ICSID Case No. ARB/13/30, Decision on Jurisdiction, June 6, 2016 |
| 23. | Opinion Advocate General Wathelet in Case C-284/16 *Slowakische Republik v Achmea* EU:C:2017:699 |
| 24. | Council and Commission Decision on the conclusion, by the European Communities, of the Energy Charter Treaty and the Energy Charter Protocol on energy efficiency and related environmental aspects EU [1998] OJ L 69 |
| 25. | Case 314/85 *Foto-Frost* EU:C:1987:452 |
| 26. | *Vattenfall AB v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the Achmea Issue (Aug. 31, 2018) |
| 27. | Joined Cases 106 to 120/87 *Asteris v Greece* EU:C:1988:457 |
| 28. | Report of the International Law Commission (ILC) A/66/10/Add.1, addressing the ICL's 2001 Guide to Practice on Reservations to Treaties |
| 29. | *Eskosol S.p.A. in liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Decision on Termination Request and Intra-EU Objection |
| 30. | Council Regulation (EU) 2015/1589 of 13 July 2015, laying down detailed rules for the application of Article 108 of the Treaty on the Functioning of the European Union [2015] EU OJ L 248 |
| 31. | European Energy Charter Conference Secretariat, Note from the Secretariat, 42/94, CONF 115 (Jan. 6, 1995), Annex 1 ("Note of Chairman") |